IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | |
|---|---|
| WILLIAM BURKE, | |
| Plaintiff, | |
| v. | Case No.: 2:26-cv-2296 |
| TRANSUNION, LLC, | |
| Defendant. | Jury Trial Demanded |

**COMPLAINT SEEKING DAMAGES FOR VIOLATIONS OF THE FAIR THE CREDIT REPORTING ACT**

**INTRODUCTION**

1.      William Burke ("Plaintiff"), by Plaintiff's attorneys, brings this action to challenge the actions and/or omissions of Defendant Transunion, LLC ("Defendant" and/or "Transunion").

2.      Plaintiff brings claims under the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA").

3.      While many violations are described below with specificity, this Complaint alleges violations of the statutes cited in their entirety.

4.      Unless otherwise stated, all of the conduct engaged in by Defendant took place in Kansas.

5.       Defendant committed each of these violations knowingly, willfully, and intentionally, and Defendant did not maintain procedures reasonably adapted to avoid any such violation.

6.       Through this Complaint, Plaintiff does not allege that any state court judgment was entered against anyone in error, and Plaintiff does not seek to reverse or modify any judgment of any state court.

1

*The Fair Credit Reporting Act*

7.    The United States Congress has found the banking system is dependent upon fair and accurate credit reporting.

8.    Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system.

9.    The FCRA protects consumers through a tightly wound set of procedural protections from the material risk of harms that otherwise flow from inaccurate reporting.

10.    Congress enacted the FCRA, to ensure fair and accurate reporting, promote efficiency in the banking system, and protect consumer privacy.

11.    Thus, through the FCRA, Congress struck a balance between the credit industry's desire to base credit decisions on accurate information, and consumers' substantive right to protection from damage to reputation, shame, mortification, and the emotional distress that naturally follows from inaccurate reporting of a consumer's fidelity to his or her financial obligations.

12.    The FCRA seeks to ensure consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy because consumer reporting agencies have assumed such a vital role in assembling and evaluating consumer credit and other information on consumers.

13.    The FCRA also imposes duties on the sources that provide credit information to credit reporting agencies, called "furnishers."

14.    As discussed in *Thornton v. Equifax Info. Servs.* No. 4:18-cv-80 (CDL), 2018 U.S. Dist. LEXIS 189052 (M.D. Ga. Nov. 5, 2018), the enactment of the Consumer Credit Reporting

Reform Act of 1996 ("CCRRA") added section 1681s-2, which imposed specific duties on furnishers of information, as well as an enforcement scheme for violations of the FCRA by those furnishers.

15. As further discussed in *Thornton*, the CCRRA was a "clear and manifest expression of Congress's intent to regulate the duties of credit information furnishers and to displace state law on this subject."

16. As such, furnishers carry a duty under the FCRA to not furnish information to a consumer reporting agency if they know or have reason to believe that the information is inaccurate.

## JURISDICTION AND VENUE

17. Jurisdiction of this Court arises under 28 U.S.C. § 1331, as Plaintiff has stated claims under federal law: the FCRA.

18. Venue is also proper pursuant to 28 U.S.C. § 1391.

19. Defendant is subject to the Court's personal jurisdiction, as Defendant conducts business within Kansas, and Defendant's conduct giving rise to this action accrued in Kansas.

## PARTIES

20. Plaintiff is a "person" and a "consumer" as those terms are defined by the FCRA. 15 U.S.C. § 1681a(a) and (b).

21. Defendant Transunion is an entity doing business in the State of Kansas.

22. Defendant's registered agent address is: Corporation Service Company, 1100 SW Wanamaker Rd., Ste. 103, Topeka, KS 66604.

23.     Defendant regularly assembles and/or evaluates consumer credit information for the purpose of furnishing consumer reports to third parties and uses interstate commerce to prepare and/or furnish the reports.

24.     Defendant is a "consumer reporting agency" as that term is defined by 15 U.S.C. § 1681a(f).

25.     Unless otherwise indicated, the use of Defendant's name in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers of Defendant.

26.     Plaintiff is informed and believes and thereon alleges that all acts of corporate employees of Defendant, as hereinafter alleged, were authorized or ratified by an officer, director or managing agent of the corporate employer.

27.     Plaintiff is informed and believes, and on that basis allege, that at all times mentioned herein Defendant was the principal, agent or employee and in acting as such principal or within the course and scope of such employment or agency, took some part in the acts and omissions hereinafter set forth by reason of which that Defendant is liable to Plaintiff for the relief prayed for herein.

## FACTUAL ALLEGATIONS

28.     Plaintiff purchased the real property located at 1506 Tauromee Ave., Kansas City, KS 66102 on or around December 12, 2012 to be used for personal, family, or household uses (the "Home").

29.     Plaintiff purchased the Home using financing provided initially by Advance Mortgage Corporation (the "Mortgage").

30. The Mortgage was transferred to JP Morgan Chase Bank, N.A. ("JPMCB") on or about October 29, 2020.

31. As indicated on the security instrument associated with the Mortgage, the original maturity date for the Mortgage was set for January 1, 2028.

32. The Mortgage was recorded with the Wyandotte County, Kansas Register of Deeds on or about December 19, 2012, book and page numbers "2012R-17919" (the "Recorded Instrument").

33. Per the Recorded Instrument, the Mortgage was collateralized by the Home.

34. On or about September 18, 2020, Plaintiff filed a Chapter 13 Bankruptcy Petition in the United States Bankruptcy Court for the District of Kansas, case number 20-21282 (the "Bankruptcy Case").

35. Pursuant to 11 U.S.C. § 1322(d), the longest that a Chapter 13 bankruptcy Plan can last is 5 years. Accordingly, the latest date that the Bankruptcy Case could complete would be September 2025.

36. January 1, 2028 is a date after September 2025.

37. JPMCB filed its Proof of Claim in the Bankruptcy Case on or about November 19, 2020.

38. Per the Proof of Claim, Plaintiff was current in his Mortgage payments when the Bankruptcy Case was filed.

39. As a secured debt which was to mature *after* the completion of the Bankruptcy Case, the Mortgage was considered to be a "Long Term Debt Not Subject to discharge" pursuant to 11 U.S.C. § 1322(b)(5) and 11 U.S.C. § 1328(a)(1).

40. This designation and treatment of the Mortgage in the Bankruptcy Case meant that the Mortgage was largely unaffected by the Bankruptcy Case.

41. During the Bankruptcy Case, Plaintiff actually paid the Mortgage off in full.

42. After paying the Mortgage in full, on or about March 22, 2021, JPMCB then executed a "Satisfaction of Mortgage."

43. The Satisfaction of Mortgage was then recorded with the Wyandotte County, Kansas Register of Deeds on or about March 23, 2021, book and page numbers 2021R-05105 (the "Mortgage Release").

44. The Mortgage Release specifically states: "JPMorgan Chase Bank, N.A. … does hereby acknowledge receipt of full payment and satisfaction of the same and of the debt thereby secured and, in consideration thereof, it does hereby cancel and discharge said mortgage upon property situated to wit."

45. In so doing, JPMCB unequivocally acknowledged that the Mortgage had been paid in full and released.

46. Upon the filing of the Mortgage Release, JPMCB released Plaintiff from any obligations under the Mortgage, the Recorded Instrument, and/or any contractual terms between Plaintiff and JPMCB.

47. After this, there was no remaining debt associated with the Mortgage, no note, Recorded Instrument, or contract remaining between the parties, and thus no debt to identify as subject to the Bankruptcy Case.

48. Plaintiff later received a discharge in the Bankruptcy Case on or about November 5, 2025.

49.     The Mortgage was not a debt that was discharged in the Bankruptcy Case, as the Mortgage debt had been paid in full pursuant to the terms of its underlying promissory note and Recorded Instrument and no longer existed at the time of the bankruptcy discharge.

50.     Moreover, even if a debt did still exist on the Mortgage at the time of discharge, the Mortgage still would not have been subject to discharge because it was considered to be a "Long Term Debt Not Subject to discharge" pursuant to 11 U.S.C. § 1322(b)(5) and 11 U.S.C. § 1328(a)(1).

51.     After the bankruptcy discharge, Plaintiff accessed his Transunion credit report and discovered that Defendant was reporting inaccurate, incomplete, and/or materially misleading information regarding the Mortgage.

52.     Defendant was reporting the Mortgage account in a way that made it appear as though the Mortgage had been discharged in the Bankruptcy Case when in fact the Home had been sold and the Mortgage had been paid in full pursuant to its contractual terms.

53.     On or about January 14, 2026, Plaintiff sent a detailed dispute to Transunion regarding the erroneous reporting (the "Credit Report Dispute").

54.     Transunion received Plaintiff's Credit Report Dispute.

55.     On information and belief, Transunion forwarded Plaintiff's Credit Report Dispute to JPMCB.

56.     Upon information and belief, JPMCB received Plaintiff's Credit Report Dispute from Transunion and thereby received notice that Plaintiff had identified inaccurate, incomplete, and/or materially misleading reporting by JPMCB regarding the Mortgage.

57.     In fact, and on information and belief, JPMCB issued a response back to Transunion regarding Plaintiff's Credit Report Dispute.

58. Defendant failed to correct the inaccurate, incomplete, and/or materially misleading information regarding the Mortgage which was appearing on Plaintiff's Transunion credit report and which was the subject of the Credit Report Disputes, as will be discussed in greater detail below.

59. Plaintiff's creditors and potential creditors have accessed Plaintiff's Transunion credit report while the disputed misreporting described herein was on Plaintiff's credit report and were misinformed by Defendant about Plaintiff's credit worthiness.

*Metro 2 Reporting Standards*

60. The reporting of accurate consumer credit information by credit reporting agencies ("CRAs") and data furnishers is foundational to credit reporting.

61. The Consumer Data Industry Association ("CDIA") is an international trade organization whose members are involved in credit reporting, mortgage reporting, check verification, tenant and employment screening, collection services, and fraud verification services.

62. The CDIA is active in state and federal legislative affairs, public relations, education, and the promulgation and implementation of industry standards for its members.

63. The CDIA works with CRAs to develop, maintain, and enhance industry-standard reporting formats and guidelines.

64. The CDIA offers training, education, and support to CRAs and data furnishers to assist them with the accurate and effective implementation of and ongoing compliance with their standards.

65. The CDIA, in cooperation with the major CRAs, publishes the Metro 2 reporting standards ("Metro 2") to assist furnishers and CRAs with their compliance requirements under the FCRA.

66.     Metro 2 is widely known and accepted as the industry standard, uniformly adopted by furnishers and CRAs alike.

67.     Metro 2 standards are documented in the Credit Reporting Resource Guide ("CRRG"), an industry-standard publication produced and distributed by the CDIA.

68.     Upon information and belief, and at all times relevant hereto, Defendant adopted and implemented the Metro 2 format as a means of fulfilling their aforementioned duties (at least in part) under the FCRA.

69.     Upon information and belief, and at all times relevant hereto, Transunion has required all entities to whom they grant consumer information reporting rights and access to adhere to the Metro 2 reporting guidelines as a condition of such ability and access.

70.     Upon information and belief, and at all times relevant hereto, JPMCB is required to have in place adequate and reasonable policies and procedures for the handling and investigation of disputed information.

71.     Upon information and belief, and at all times relevant hereto, JPMCB has adopted and implemented the Metro 2 format as a means of fulfilling their aforementioned duties under the FCRA.

72.     Upon information and belief, pursuant to Metro 2, upon being paid in full, an account should be updated to reflect a status code "Paid or Closed Account/zero balance".

73.     Upon information and belief, Metro 2 format provides a code that furnishers must affirmatively use to remove bankruptcy remarks from a tradeline reporting on a consumer's credit reports otherwise the tradeline will continue to report as included in bankruptcy.

74.     Upon information and belief, Defendant are familiar with Metro 2's codes and procedures for removing bankruptcy information from tradelines.

75. Upon information and belief, after the payment in full on the Mortgage to JPMCB, even though there was no longer a debt owed to JPMCB or otherwise identified in Plaintiff' bankruptcy proceeding as a mortgage debt owed to JPMCB, Defendant did not remove bankruptcy remarks from the tradeline it reported on Plaintiff' credit reports related to the Mortgage.

76. Upon information and belief, even after Plaintiff provided notice to Defendant of their inaccurate, incomplete, and/or materially misleading reporting of the relevant JPMCB account, Defendant continued to report a tradeline by JPMCB associated with the Mortgage with bankruptcy information well after the Home had been sold and the Mortgage was paid in full, and after successful completion of Plaintiff's Bankruptcy Case.

77. The failure on the part of a CRA and/or furnisher to adhere to Metro 2 standards can itself support a finding of a willful violation of the FCRA as described by 15 U.S.C. § 1681n when that failure results in a report that is inaccurate, incomplete, and/or misleading. *See Gillespie v. Equifax Info. Servs., LLC*, No. 05C138, 2008 WL 4316950, at *8 (N.D. Ill. Sept. 15, 2008).

78. Metro 2 provides guidelines and answers to frequently asked questions for common issues that arise related to the reporting of consumer accounts, but Metro 2 guidelines cannot—and do not—account for every theoretical issue furnishers and consumer reporting agencies must address; thus, furnishers and consumer reporting agencies must use logic and common sense to address issues that arise that are not contemplated by Metro 2's instructions or frequently asked questions.

79.     Additionally, blind adherence to Metro 2 reporting standards does not relieve CRAs or furnishers from liability on reporting information that is in-and-of-itself objectively inaccurate, incomplete, and/or materially misleading.

80.     As an example, data points such as balance, recent payment data, and scheduled payment data should be reported on a consumer's report during the pendency of a Chapter 13 bankruptcy based on Metro 2 reporting standards.

81.     For those data points, Metro 2 calls for objectively accurate information that helps identify the liabilities of a consumer.

82.     However, Metro 2 calls for suppressing historical payment data by imputing a bankruptcy code in the historical section of a credit report.

83.     This suppression feature of Metro 2 provides an inaccurate, incomplete, and/or materially misleading view of a consumer's payment history that misinforms viewers of a consumer's credit report about the consumer's actual payment history on an account.

84.     Furnishers and CRAs under Metro 2 choose to supplant a consumer's actual, positive payment data with a code that is inconsistent with the historical payments that a consumer has actually made.

85.     Pursuant to Metro 2, the bankruptcy coding in the historical payment section makes it appear as though the consumer has not made any payments during the course of their bankruptcy—thus creating an inaccurate, incomplete, and/or materially misleading representation of the consumer's payment history.

86.     This payment suppression feature utilized by furnishers and CRAs unfairly penalizes a consumer for entering bankruptcy—even if the consumer continues to pay the creditor on time every month, as agreed.

87. Payment history is the single largest individual factor in a consumer's credit score.

88. Failing to report payment history and instead imposing a blanket code in that section is not only inaccurate, incomplete, and/or materially misleading, but also punitive to the consumer as it prevents the consumer from actualizing a factor that, again, is the single biggest factor that contributes to the determination of that consumer's credit score and/or creditworthiness.

89. Additionally, continuing to report a bankruptcy indicator on an account that was paid in full (and also was an account classified as a long-term debt not subject to discharge) gives the objectively inaccurate, incomplete, and/or materially misleading impression that the account was discharged and/or was subject to discharge when in fact (1) the account was never treated that way in the bankruptcy, and (2) the account cannot be subject to discharge because it has already been paid in full.

90. Accuracy is paramount with regard to compliance with the FCRA.

91. Policies and procedures such as Metro 2 may help standardize reporting in an effort to reach accuracy, but complying with Metro 2 does not necessarily mean the reporting is objectively accurate.

92. That is to say, a party may comply with Metro 2's reporting standards, but still report objectively inaccurate, incomplete, and/or materially misleading information that causes a consumer harm.

### *The Transunion Credit Report*

93. After the conclusion of the Bankruptcy Case, Plaintiff accessed his Transunion credit reports and found a tradeline for the Mortgage being reported by Transunion and JPMCB (the "Mortgage Account")

94. Transunion and JPMCB were reporting numerous inaccurate, incomplete, and/or materially misleading remarks regarding the Mortgage.

95. On Plaintiff's December 29, 2025 Transunion credit report, the Mortgage Account reported remarks of "Chapter 13 Bankruptcy; Closed".

96. Further, the Mortgage Account on Plaintiff's Transunion credit report did not contain any payment history during the pendency of the Bankruptcy Case on Plaintiff's Transunion credit report.

97. By reporting after conclusion of the Bankruptcy Case the Mortgage as "Chapter 13 Bankruptcy; Closed", Transunion and JPMCB incorrectly made it appear as though the Mortgage was discharged through Plaintiff's Bankruptcy Case.

98. The Mortgage was not discharged in the Bankruptcy Case.

99. It is inaccurate, incomplete, and/or materially misleading for Transunion and JPMCB to report any derogatory collection information which was inconsistent with the Orders entered by the Bankruptcy Court.

100. It is inaccurate, incomplete, and/or materially misleading for Transunion and JPMCB to report bankruptcy indicators on a debt that was paid in full and therefore not subject to the Bankruptcy Case.

101. However, Transunion and JPMCB each either reported or caused to be reported inaccurate, incomplete, and/or materially misleading information about the Mortgage after the Bankruptcy Case as discussed herein.

*Plaintiff's Credit Reporting Dispute to Defendant*

102. On or about January 14, 2026, Plaintiff disputed Transunion and JPMCB's reporting of the Mortgage Account pursuant to 15 U.S.C. § 1681i by notifying Transunion and

13

JPMCB, in writing, of the inaccurate, incomplete, and/or materially misleading credit information they were reporting about the Mortgage.

103. Plaintiff sent a letter to Transunion requesting the above inaccurate, incomplete, and/or materially misleading derogatory information be updated, modified, or corrected as to the Mortgage Account.

104. Transunion was required to conduct a reinvestigation into the Mortgage Account on Plaintiff's consumer report pursuant to 15 U.S.C. § 1681i.

105. Transunion was required to send notice of Plaintiff's dispute to JPMCB pursuant to 15 U.S.C. § 1681i(a)(2).

106. A reasonable reinvestigation by Transunion would have indicated that it was reporting the Mortgage Account inaccurately, incompletely, and/or in a materially misleading way on Plaintiff's Transunion credit report.

107. Instead, after receipt of Plaintiff's dispute, Defendant re-reported the Mortgage Account inaccurately, incompletely, and/or in a materially misleading way.

*The Continued Inaccurate Reporting of the Mortgage Account on Plaintiff's Transunion*

*Reports*

108. In its subsequent reporting following Plaintiff's dispute, Transunion failed to remove or correct the inaccurate, incomplete, and/or materially misleading information contained in the Mortgage Account from Plaintiff's Transunion credit report.

109. Instead, in Plaintiff's May 11, 2026 Transunion credit report, Transunion continued to report the Mortgage Account in an inaccurate, incomplete, and/or materially misleading way.

110.    Specifically, Transunion continued to report the Mortgage Account as "Chapter 13 Bankruptcy; Closed".

111.    Further, Transunion updated the Pay Status to state ">Account Included in Bankruptcy<".

112.    Transunion's reporting was inaccurate, incomplete, and/or materially misleading because continuing to report bankruptcy indicators on the Mortgage Account after the date of discharge of the Bankruptcy Case make it appear as if the Mortgage was discharged in the Bankruptcy Case when it was not.

113.    Despite receiving written notice of the errors on the Mortgage Account, Transunion still got it wrong in its subsequent re-reporting of the Mortgage Account.

## DAMAGES

### *The Impact of Inaccurate or Misleading Information on Consumer Reports*

114.    A "Consumer Report", as defined by 15 U.S.C. § 1681a(d)(1), impacts a consumer's eligibility for:

      i.    credit or insurance to be used primarily for personal, family, or household purposes;

      ii.    employment purposes; or

      iii.    any other purpose authorized under section 1681b.

115.    As a result, the information held within a consumer report impacts not only a consumer's credit worthiness, rating, and capacity, but also the character, general reputation, and personal characteristics of the consumer.

116.    A Federal Trade Commission study mandated by Congress on credit report accuracy ("FTC Study") found that one in five consumers had an error on at least one of their

three major credit reports (Equifax, Experian, and Trans Union), with some consumers experiencing inaccuracies that can depress credit scores by over 100 points. *See* https://www.ftc.gov/news-events/press-releases/2013/02/ftc-study-five-percent-consumers-had-errors-their-credit-reports.

117.    The FTC Study found that the types of errors on consumer reports could lead to consumers paying more for products such as auto loans and insurance. *See* https://www.ftc.gov/news-events/press-releases/2013/02/ftc-study-five-percent-consumers-had-errors-their-credit-reports.

<u>*Credit Scoring*</u>

118.    The Fair Isaac Corporation credit risk scoring system, commonly referred to as "FICO", is the leading credit scoring system and utilizes data reported by credit reporting agencies. *See,* https://www.myfico.com/credit-education/credit-scores/.

119.    Defendant' inaccurate, incomplete, and/or materially misleading credit reporting has caused Plaintiff to suffer from reduced FICO credit scores.

120.    The Fair Isaac Corporation uses the data in consumer reports to calculate consumers' credit scores (also known as credit risk scores).

121.    The term "credit score" is a numerical value or a categorization derived from a statistical tool or modeling system used by a person who makes or arranges a loan to predict the likelihood of certain credit behaviors, including default. Consumer Financial Protection Bureau, *Supervision and Examination Manual, Version 2* (October 2012), p. 53, available at http://files.consumerfinance.gov/f/201210_cfpb_supervision-and-examination-manual-v2.pdf, *archived at* http://perma.cc/JF32-RFAA.

122.   FICO scores are calculated from five main categories of credit data in a consumer's credit report. Those categories, and their weighted values, are as follows: payment history accounts for 35% of a consumer's FICO score; debt/amounts owed accounts for 30% of a consumer's FICO score; age/length of credit history accounts for 15% of a consumer's FICO score; new credit/recent inquiries accounts for 10% of a consumer's FICO score; and mix of accounts/types of credit accounts for 10% of a consumer's FICO score. *See*, https://www.myfico.com/credit-education/whats-in-your-credit-score/, *archived at* https://perma.cc/E8Y3-F4AA.

123.   Payment history is the most important aspect of a consumer's credit score because it shows how the consumer has managed his finances, including any late payments. Credit history is also very important, as it demonstrates how long the consumer has been managing his accounts, when his last payments were made, and any recent charges. *See*, https://www.transunion.com/credit-score, *archived at* https://perma.cc/NRZ4-W83U.

124.   The cost of credit (e.g., interest rates, fees, etc.), the availability of credit, ratings for insurance products, and even unsolicited credit offers, such as the opportunity to refinance a mortgage at a lower interest rate, extended financing periods and lower rate auto loans, and even zero-percent financing credit offers for in-store credit lines, are all, by and large, driven by a consumer's credit score.

125.   Inaccurate, incomplete, and/or materially misleading credit reporting very often results in a lower FICO and other credit scoring model scores, and thus higher costs of credit, diminished opportunity, and less purchasing power for consumers.

126.   Consistent with FTC study, the Fair Isaac Corporation states that inaccurate or incorrect information on a consumer's credit report can hurt their score. *See*,

17

https://www.myfico.com/credit-education/questions/fix-errors-on-credit-report/, *archived at* https://perma.cc/9TQN-S5WP.

127.    There is no established rule or threshold for classifying the significance of a credit score change as minor or major because the impact of a change in score is dependent on the current score. For example, a one-point change in credit score that moves the consumer from one risk tier to the next may have a large impact on the consumer's access to credit or the products and rates the consumer is able to secure.

128.    How the inaccurate, incomplete, and/or materially misleading reporting on an account impacts a credit score is measured by what a consumer's credit score was because of the inaccurate, incomplete, and/or materially misleading reporting on an account versus what it should have been had the account been reported correctly and accurately.

*Defendant' Failures and Plaintiff' Damages*

129.    It is inaccurate, incomplete, and/or materially misleading to report that an account is included in and/or discharged in bankruptcy when it was not.

130.    Reporting an account was "included in bankruptcy" has no meaningful difference from reporting that an account was "discharged in bankruptcy"—that is, the phrases are viewed as having the same meaning. *See Diaz v. Trans Union, LLC*, No. 1:18-cv-01341-DAD-EPG, 2019 U.S. Dist. LEXIS 95549, at *7 (E.D. Cal. June 5, 2019) "Indeed, many courts considering this very issue have concluded that "[t]here is no meaningful difference between the phrase `included in bankruptcy' and the phrase `discharged in bankruptcy.'") (*citing Butler v. Equifax Info. Servs., LLC*, No. 5:18-cv-02084-JGB-SHK (C.D. Cal. Apr. 3, 2019); *Smith v. Trans Union, LLC*, No. 2:18-cv-13098-GCS-SDD (E.D. Mich. May 10, 2019); *Fleming v. Trans Union, LLC*, No. 2:18-cv-9785-PA-PLA (C.D. Cal. March 8, 2019).

131.    It is inaccurate, incomplete, and/or materially misleading to report an account with bankruptcy remarks suggesting it was included in bankruptcy when the account was not subject to discharge in a bankruptcy.

132.    It is inaccurate, incomplete, and/or materially misleading to suggest an account was discharged in bankruptcy when it was in fact paid in full.

133.    It is inaccurate, incomplete, and/or materially misleading to suggest an account was discharged in bankruptcy when the account in question no longer existed at the time a bankruptcy discharge was entered.

134.    As evidenced by Transunion's failures to correct the reporting of the Mortgage Account despite receiving Plaintiff' credit report dispute and the supporting documents attached to the dispute, Transunion failed to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates as required by and in violation of 15 U.S.C. § 1681e(b).

135.    As evidenced by the inaccurate re-reporting after Plaintiff sent Defendant detailed disputes identifying the inaccurate, incomplete, and/or materially misleading information related to the Mortgage Account, Defendant, upon receipt of Plaintiff' dispute, failed to conduct proper and reasonable investigations/reinvestigations concerning the inaccurate information after receiving notice of the disputes from Plaintiff in violation of 15 U.S.C. §1681i.

136.    Defendant failed to review all relevant information provided by Plaintiff in the disputes to Defendant, as required by and in violation of 15 U.S.C. § 1681i.

137.    Due to Defendant's failure to reasonably investigate, Defendant further failed to correct and update Plaintiff' information as required by 15 U.S.C. § 1681i, thereby causing

continued reporting of inaccurate, incomplete, and/or materially misleading information in violation of 15 U.S.C. § 1681i.

138.    Defendant's inaccurate, incomplete, and/or materially misleading reporting of the Mortgage Account in light of its knowledge of the actual error was willful. Plaintiff is, accordingly, eligible for statutory damages as to Defendant.

139.    Reckless disregard of a requirement of the FCRA qualifies as a willful violation of the FCRA within the meaning of § 1681n(a). *See Safeco Ins. Co. of Am. V. Burr*, 551 U.S. 47, 71 (2007).

140.    Upon receipt of Plaintiff's credit reporting dispute, Defendant was on notice that Plaintiff had paid the Mortgage in full, and therefore there was no debt held by JPMCB to include or discharge in the Bankruptcy Case.

141.    Based upon Defendant's knowledge of the Mortgage Account, even if Defendant could claim it did not willfully violate the FCRA, its conduct was at the very least done with reckless disregard of its obligations under 15 U.S.C. § 1681e(b), and/or 15 U.S.C. § 1681i.

142.    As a result of Defendant's continued inaccurate, incomplete, and/or materially misleading and negative reporting, Plaintiff has suffered actual damages, including, without limitation, fear of credit denials, actual credit denials, reduced credit scores, damage to Plaintiff's creditworthiness, emotional distress, frustration, missed personal and professional time in order to tend to this matter, and inconvenience.

143.    By reporting account information inaccurately, incompletely, and/or in a materially misleading way, Defendant's acts and omissions have resulted in the illegitimate suppression of Plaintiff's FICO credit scores and other credit rating model scores.

144. Defendant is depriving Plaintiff of positive credit data that should be helping to support Plaintiff's credit score.

145. The negative difference in credit score relates to what his score *should be* versus what it is in light of the inaccurate, incomplete, and/or materially misleading reporting as described herein.

146. Measuring what a score *should be* if inaccurate, incomplete, and/or materially misleading information is removed is something a person with experience in the consumer credit space and/or credit scoring algorithms, such as an expert, can provide analysis upon.

147. Upon information and belief, the adverse effect on Plaintiff's credit score places Plaintiff at the material risk of being denied credit or receiving less favorable credit terms than they otherwise would.

148. The existence of consumer reports which inaccurately, incompletely, and/or materially misleadingly report the Mortgage, and/or falsely suggest that the Mortgage has been discharged or was subject to discharge, also make it inherently more difficult for Plaintiff to obtain a mortgage in the future.

149. The inaccurate, incomplete, and/or materially misleading information negatively reflects upon Plaintiff, Plaintiff's credit repayment history, Plaintiff's financial responsibility as a debtor, and Plaintiff's creditworthiness.

150. Plaintiff's consumer report(s) were published to third parties while the inaccurate, incomplete, and/or materially misleading disputed information on the Mortgage Account.

151. As a result, Defendant essentially made false and/or materially misleading statements about Plaintiff to third parties and those third parties were thereby misinformed about Plaintiff's creditworthiness.

21

152. Negative information about the Mortgage Account that made it appear as though the Mortgage was still in bankruptcy or discharged in bankruptcy—instead of paid off during the course of Plaintiff' Bankruptcy Case—causes any viewer of Plaintiff's Transunion credit report to believe that Plaintiff never paid their Mortgage during the course of the Bankruptcy Case and instead that the Mortgage was discharged without payment.

153. Transunion caused this negative and incorrect perception through its reporting and third parties that viewed Plaintiff's credit report were misinformed, to Plaintiff's detriment, as a result.

154. As a result of the inaccurate, incomplete, and/or materially misleading information on the Mortgage Account being published to third parties, Transunion caused Plaintiff a reputational harm akin to defamation.

155. By reporting account information inaccurately, incompletely, and/or in a materially misleading way after notice and confirmation of their respective errors, Defendant failed to take the appropriate measures as required under 15 U.S.C. § 1681i and/or 15 U.S.C. § 1681s-2(b).

**COUNTS**

**COUNT ONE**
**Violations of 15 U.S.C. § 1681e(b) by Transunion**

156. Plaintiff repeats, re-alleges, and incorporates by reference all above paragraphs.

157. Defendant Transunion's acts and omissions as described in this Complaint were in violation of 15 U.S.C. § 1681e(b).

158. As described in this Complaint, Transunion failed to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the reports relate—i.e. Plaintiff.

159. Transunion's violations of 15 U.S.C. § 1681e(b) caused Plaintiff damages that were specifically caused by Transunion.

160. The above-described violations by Transunion were willful, allowing Plaintiff to recover under 15 U.S.C. § 1681n.

161. As a result of each and every willful violation of the FCRA, Plaintiff is entitled to actual damages or statutory damages of not less than $100.00 and not more than $1,000.00, pursuant to 15 U.S.C. § 1681n(a)(1)(A); punitive damages as the court may allow, pursuant to 15 U.S.C. § 1681n(a)(2); and costs together with reasonable attorneys' fees pursuant to 15 U.S.C. § 1681n(a)(3) from Transunion.

162. In the alternative, Transunion was negligent in its actions, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

163. As a result of each and every negligent violation of the FCRA, Plaintiff is entitled to actual damages, pursuant to 15 U.S.C. § 1681o(a)(1); and costs together with reasonable attorneys' fees pursuant to 15 U.S.C. § 1681o(a)(2), from Transunion.

## COUNT TWO
### Violations of 15 U.S.C. § 1681i by Transunion

164. Plaintiff repeats, re-alleges, and incorporates by reference all above paragraphs.

165. Defendant Transunion's acts and omissions as described in this Complaint were in violation of 15 U.S.C. § 1681i.

166. As described in this Complaint, Transunion failed to conduct a reasonable reinvestigation into Plaintiff's credit reporting dispute and caused to be reported inaccurate, incomplete, and/or materially misleading information on Plaintiff's credit reports.

167. Transunion's violations of 15 U.S.C. § 1681i caused Plaintiff damages specifically caused by Transunion.

168.    The above-described violations by Transunion were willful, allowing Plaintiff to recover under 15 U.S.C. § 1681n.

169.    As a result of each and every willful violation of the FCRA, Plaintiff is entitled to actual damages or statutory damages of not less than $100.00 and not more than $1,000.00, pursuant to 15 U.S.C. § 1681n(a)(1)(A); punitive damages as the court may allow, pursuant to 15 U.S.C. § 1681n(a)(2); and costs together with reasonable attorneys' fees pursuant to 15 U.S.C. § 1681n(a)(3) from Transunion.

170.    In the alternative, Transunion was negligent in its actions, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

171.    As a result of each and every negligent violation of the FCRA, Plaintiff is entitled to actual damages, pursuant to 15 U.S.C. § 1681o(a)(1); and costs together with reasonable attorneys' fees pursuant to 15 U.S.C. § 1681o(a)(2), from Transunion.

**REQUEST FOR JURY TRIAL**

172.    Plaintiff is entitled to, and demands, a trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the Court grant Plaintiff the following relief against Defendant:

1. A declaratory judgment that Defendant's actions as discussed herein are unlawful;

2. Plaintiff's actual damages related to violations of the FCRA from Defendant in amounts caused by Defendant;

3. Statutory damages of not less than $100 and not more than $1,000 to Plaintiff related to violations of the FCRA, pursuant to 15 U.S.C. § 1681n(a)(1), against Defendant;

4. Punitive damages related to violations of the FCRA, pursuant to 15 U.S.C. § 1681n(a)(2), from Defendant;

5. An award of costs of litigation and reasonable attorneys' fees related to violations of the FCRA, pursuant to 15 U.S.C. §§ 1681n(a)(3) and/or 1681o(a)(2), from Defendant; and

6. Any such other and further relief as this Court deems just and proper.

Date:   05/19/2026                                                Respectfully Submitted,


by: /s/ James R. Crump

James R. Crump, KS 78704
Ryan Callahan, KS 25363
**Callahan Law Firm, LLC**
222 W. Gregory Blvd., Suite 210
Kansas City, MO 64114-1138
Ph: 816-822-4041
james@callahanlawkc.com
ryan@callahanlawkc.com